UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division



UNITED STATES OF AMERICA,

v.  CRIMINAL NO. 2:13cr81

ANTONIO LASHLEY MIZZELL,

Defendant.

## OPINION AND ORDER

This matter comes before the court on the Defendant's motion to suppress evidence obtained by law enforcement following the stop of the vehicle in which the Defendant was a passenger on May 7, 2013 ("Motion"). The court held a hearing on the Motion on September 30, 2013, at which the United States put forth uncontested evidence regarding the events surrounding the vehicle stop. For the reasons set forth from the bench and herein, the court **DENIES** the Defendant's Motion.[1]

## I. Findings of Fact[2]

On May 7, 2013, agents of the Norfolk Drug Enforcement Administration ("DEA") Task Force and the Federal Bureau of

---

[1] The court issued its opinion orally from the bench, but reserved the option to issue a written opinion at a later date.

[2] The court bases its findings of fact on the evidence presented in the hearing on the Motion, at which four law enforcement officials testified. Special Agent Kevin Cox, Task Force Officer Lionel Jackson, Special Agent Brian Reynaldo, and Agent Gary Parker gave credible and consistent testimony regarding the circumstances of the vehicle stop, the pat-down of the Defendant, the Miranda advisement to the Defendant, and the subsequent search of the Defendant. The Defendant did not present any witnesses or other evidence.

Investigation established surveillance at 1825 Somerset Place, Virginia Beach, Virginia, which, according to a confidential informant, was the residence of Bryan Grimes. The previous day, Mr. Grimes had been charged in federal court in the Eastern District of Virginia with conspiracy to distribute and possess with the intent to distribute cocaine. The purpose of the surveillance was to execute a valid arrest warrant on Mr. Grimes.

Prior to May 7, 2013, Task Force Officer Lionel Jackson had distributed a photograph of the Defendant to other agents on the surveillance team, and informed them that the Defendant was a known associate of Mr. Grimes, and that the Defendant had recently been released from prison for various drug convictions and was residing at a local halfway house. Special Agent Cox, another member of the surveillance team, was also aware from a confidential source that the Defendant and Mr. Grimes had expressed an intention while incarcerated to commence selling narcotics again upon their release from prison. As additional context regarding the circumstances of the surveillance, the residence at 1825 Somerset Place was the location at which Keith Everett, another known associate of Mr. Grimes and the Defendant, had been arrested approximately one month prior on federal narcotics charges. At the time of Mr. Everett's arrest,

the residence was searched and narcotics were found on the premises.

At approximately 1:30 pm on May 7, 2013, a gray vehicle occupied by two black males pulled into the garage at 1825 Somerset Place. At this time, the agents could not conclusively identify the individuals in the vehicle. Approximately three hours later, at 3:50 pm, the vehicle came out of the garage and pulled onto the street. The agents confirmed the driver was Mr. Grimes and conducted a traffic stop of the vehicle. Mr. Grimes was removed from the vehicle, informed that he was under arrest, and placed in handcuffs. Special Agent Cox recovered a large amount of currency and two baggies with a few ounces of cocaine from Mr. Grimes' pockets. He placed these items on the trunk of the vehicle in plain view of the other law enforcement agents/officers on the scene.

At approximately the same time, Special Agent Reynaldo removed the Defendant from the vehicle and then conducted a pat-down of the Defendant for officer safety, starting with his head and moving lower, in accordance with standard pat-down procedures. During the course of the pat-down, in the area of the Defendant's crotch, using a flat, vertical hand, Special Agent Reynaldo felt a bulge that was inconsistent with the male anatomy. Upon inquiry, the Defendant initially informed Special

3

Agent Reynaldo that the bulge was a "medical pin." As it plainly did not exhibit the physical characteristics of a surgically implanted pin, Special Agent Reynaldo queried further, and the Defendant then readily admitted the bulge was cocaine, stating "it's powder."

Task Force Agent Gary Parker then advised the Defendant of his <u>Miranda</u> rights at approximately 4:05 pm, after which time the agents took the Defendant into the garage of Mr. Grimes' residence. After an agent loosened the Defendant's belt by pulling it slightly forward, the Defendant kicked his leg a few times, causing two bags of cocaine to fall through his pant leg to the floor. At no time were the Defendant's belt, pants, or shirt removed, nor was he searched further. There was no "strip search" of the Defendant at any time. The Defendant remained in custody and was later questioned that same evening at the Norfolk DEA field office for approximately one hour, from 7 pm to 8 pm.

On July 3, 2013, the Defendant moved to suppress (1) the evidence obtained at the vehicle stop; and (2) the Defendant's subsequent statements to law enforcement, alleging that the agents conducted an illegal "strip search" of the Defendant, and that his statements following the search constitute "fruit of

the poisonous tree." Mem. Supp. Mot. at 1-2; see, e.g., United States v. Ceccolini, 435 U.S. 268, 275 (1978).

## II. Legal Framework

Neither party questions the propriety of the vehicle stop for the purpose of serving a valid arrest warrant on Mr. Grimes. As the stop was lawful, the first prong of the framework outlined by the United States Supreme Court in Terry v. Ohio, 392 U.S. 1 (1968), is satisfied. In Terry, the Supreme Court also held that an investigatory "stop and frisk" may be conducted without violating the Fourth Amendment's ban on unreasonable searches and seizures, provided that the officer reasonably suspects that the person stopped is armed and dangerous. Arizona v. Johnson, 555 U.S. 323, 326-27 (2009) (citing Terry, 392 U.S. at 23-24). An officer also "may order passengers to get out of the car pending completion of the stop." Maryland v. Wilson, 519 U.S. 408, 415 (1997). In order to conduct a pat-down of a passenger, the officer must have a reason "beyond the mere justification for the traffic stop." United States v. Sakyi, 160 F.3d 164, 169 (4th Cir. 1998). A pat-down is permitted only when the officer "perceive[s] an appropriate level of suspicion of criminal activity and apprehension of danger." Id.

5

"[R]easonable suspicion of a suspect's dangerousness need not be based solely on activities observed by the police during or just before the relevant police encounter." United States v. Holmes, 376 F.3d 270, 278 (4th Cir. 2004). An officer's knowledge that an individual often carries firearms, or has prior convictions involving firearms, may contribute to an officer's assessment that the individual is armed and dangerous. United States v. Spivey, 287 F. App'x 240, 241 (4th Cir. 2008) (citing Holmes, 376 F.3d at 278).

Additionally, the Fourth Circuit has also observed that "guns often accompany drugs." Sakyi, 160 F.3d at 169. Thus, under Fourth Circuit precedent, a reasonable suspicion that illegal drugs are in the vehicle constitutes sufficient justification for briefly patting down all the vehicle's occupants for weapons, absent other factors to allay the officer's safety concerns. United States v. Rooks, 596 F.3d 204, 210 (4th Cir. 2010); Sakyi, 160 F.3d at 169. The pat-down "must be strictly 'limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby.'" Minnesota v. Dickerson, 508 U.S. 366, 373 (U.S. 1993) (citing Terry, 392 U.S. at 26). However:

> "[i]f a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond

6

that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context."

Dickerson, 508 U.S. at 375-76. "Once an officer has determined that the object is not a weapon, however, and if its shape or size does not indicate its contraband nature, the search must stop." United States v. Raymond, 152 F.3d 309, 312 (4th Cir. 1998).

### III. **Analysis**

Applying these legal principles to the evidence adduced at the hearing, it is abundantly clear that the pat-down was justified for officer safety and that it did not exceed constitutional scope. First, in considering whether the agents may have reasonably believed the Defendant to be armed and dangerous, the court looks to the context of the vehicle stop. Mr. Grimes, the driver of the vehicle, was a felon who was wanted on drug charges. The house under surveillance was the location at which drugs had been found pursuant to a prior search and arrest of another felon, Keith Everett. As the agents all testified at the hearing, they are well aware of the frequency with which guns accompany drugs. These specific facts alone engender reasonable suspicion that the passenger of the vehicle may have been armed and dangerous. See Sakyi, 160 F.3d

at 169 ("The indisputable nexus between drugs and guns presumptively creates a reasonable suspicion of danger to the officer."). Additionally, Special Agent Reynaldo, who conducted the pat-down, stated that at the time he knew that the Defendant may be accompanying Mr. Grimes, and that the Defendant had previously been arrested for narcotics distribution.[3]

With respect to the scope of the pat-down, Special Agent Reynaldo used appropriate hand gestures to evaluate a suspicious bulge in the Defendant's groin area, the nature of which he could not identify initially as a firearm or some other object. When queried, the Defendant lied regarding what the object was, and when immediately confronted with his lie, he readily admitted it was contraband. This brief interrogation, during which the Defendant admitted he possessed narcotics, did not exceed the scope of a noncustodial Terry stop. See United States v. Leshuk, 65 F.3d 1105, 1110 (4th Cir. 1995) (citing Berkemer v. McCarty, 468 U.S. 420, 439 (1984) (observing that Terry stops typically involve the officer asking "a moderate number of questions to determine [the detainee's] identity and to try to

---

[3] While Special Agent Reynaldo was not specifically aware of the Defendant's physical identity at the time of the pat-down, he indicated he was aware the Defendant was a known associate of Mr. Grimes. Even if Special Agent Reynaldo had no knowledge of the identity of the Defendant, a pat-down for officer safety was entirely appropriate given the circumstances of the stop. See United States v. Sakyi, 160 F.3d 164, 169 (4th Cir. 1998).

8

obtain information confirming or dispelling the officer's suspicions")).

Notably, the agents did not search the Defendant and recover the drugs until the Defendant offered that it was contraband, and until the Defendant received Miranda warnings. See Raymond, 152 F.3d at 312 (holding that an officer may not lawfully seize an object during a pat-down, unless the officer knows by "plain feel" that it is contraband); see also Berkemer, 468 U.S. at 439 (holding that a "detainee is not obliged to respond [to an officer's questions,] [a]nd unless the detainee's answers provide the officer probable cause to arrest him, he must then be released); Rawlings v. Kentucky, 448 U.S. 98, 111 (1980) ("Once petitioner admitted ownership of the [drugs], the police clearly had probable cause to place petitioner under arrest."). Distinguishing this case from the unconstitutional seizure described in Raymond, are the facts that Special Agent Reynaldo did not seize the object during the pat-down, rather he queried what it was, to which the Defendant first lied and then readily admitted it was contraband, after which the Defendant was arrested, given his Miranda warnings, and then the contraband was seized.[4]

---

[4] Moreover, the agents may have had probable cause to arrest the Defendant prior to the pat-down which revealed the drugs. See Brinegar v. United States, 338 U.S. 160, 175-76 (1949). At the

9

The Defendant's characterization of the search in the garage of the residence as a "strip search" is utterly meritless, as is any alleged issue posed by the gap between when the Defendant was advised of Miranda warnings and questioned at the location of the stop, at approximately 4 pm, and his subsequent questioning at the Norfolk DEA field office a few hours later, at approximately 7 pm. See United States v. Frankson 83 F.3d at 79, 83 (4th Cir. 1996) ("Courts have consistently upheld the integrity of Miranda warnings even in cases where 'several hours' have elapsed between the reading of the warning and the interrogation.").

## IV. Conclusion

The evidence before the court conclusively shows that (1) the vehicle stop was justified; (2) the pat-down was necessary for officer safety; (3) the pat-down was appropriate in scope;

---

time of the traffic stop, the Defendant remained in federal custody as a resident of the Residential Reentry Center, a halfway house. As a condition of his release to the halfway house he was required to secure full-time employment and was only permitted to go to designated locations on a Sign-in/Sign-out sheet the halfway house maintained. See Resp. Ex. B-D. He appears to have been in violation of all of these conditions on May 7, 2013. Additionally, the Defendant acknowledged, upon entering the halfway house, that he was "subject to searches of [his] person and property at any time." Id. Ex. D. Thus, under a totality of the circumstances analysis, the pat-down was unquestionably appropriate. See Samson v. California, 547 U.S. 843, 857 (2006); United States v. Knights, 534 U.S. 112, 119 (2001). The court need not reach these issues, however, as the pat-down was clearly justified by reasonable suspicion that the Defendant was armed and dangerous, as discussed supra at 7-8.

(4) the Defendant received proper Miranda warnings; (5) the search of his person in the garage to recover contraband he had admitted was in his pants was constitutional; and (6) the subsequent questioning at the DEA field office was constitutional. Accordingly, the Defendant's Motion is **DENIED**. The Clerk is **DIRECTED** to forward a copy of this Opinion and Order to counsel for the Defendant and the United States.

**IT IS SO ORDERED.**

/s/
Rebecca Beach Smith
Chief
United States District Judge

REBECCA BEACH SMITH
CHIEF UNITED STATES DISTRICT JUDGE

October 15, 2013

nunc pro tunc September 30, 2013